My name is Manpreet Singara and I will be arguing on behalf of the petitioners. Petitioners Celestino Matias-Jeronimo and Victoria Pablo-Jeronimo are both husband and wife. They are Guatemalan citizens and they belong to the Mamayan indigenous community. Having come to the United States they applied for asylum here in San Francisco and the asylum claim was denied by the immigration judge. We're here on a motion to reopen, right? Both. These are consolidated proceedings. But you have to get past the motion to reopen before you get to the merits of everything, right? Yes, ma'am. So we've got to decide whether the VA has used its discretion in denying the motion to reopen, right? Yes, ma'am. So what evidence would you put on to establish by clear and convincing evidence that Matias' asylum application was filed within one year of entry? His testimony and the testimony of his wife. Your Honor, please be mindful of the fact that they were two separate applications that were filed by the petitioners. And both the petitioners testified individually to the merits of the claim. Well, is Rosa going to be available to testify? The person that you've identified as Rosa? She was not available at that point, Your Honor, but at the time when we filed the motion we were able to locate her and she did provide a statement. Well, I know that, but is she going to be available? I believe so, yes, Your Honor, she would be. She's down in Southern California. And that's what our motion to reopen was all about. I know. So if she does testify, how is that going to change the result if the immigration judge thinks that Matias was lying about leaving the United States after being arrested? Right. Your Honor, the background in which the case was set up was that on one hand, Mr. Matias, when he was before the asylum officer, he did testify that he had been in this country, that he entered the country in 2004, and he did not talk about the fact that he had been previously in this country. But when the case, when he was placed in removal proceedings, at that point the amendments were made, but all along he has maintained that he entered on April of 2004. And that is what Ms. Rosa is going to testify to, because if you look at the IJ's decision, you know, he basically in his decision, the immigration judge, and as appealed by the board, they have discounted Mr. Matias' testimony because of what he had stated at the asylum officers. If I understand correctly, after the IJ initially ruled that the asylum application was untimely, you came up with this new evidence to prove that it really was timely. Is that right? Not while the case was still before the judge, Your Honor. No, I know. Yes, at a later point. Right. And then the BIA said, we're not going to pass upon whether this new information helps you or doesn't help you because even if it's timely, you don't have any ground for relief substantively. That is correct, Your Honor. And they say that's because, or among other things, you don't have enough for a humanitarian grant. That is correct. That's the concern I have. I'm having a hard time understanding why they wouldn't have grounds for a humanitarian grant. What's your best argument that they do have humanitarian basis for relief, for asylum? Thank you, Judge. Your Honor, what happened in Tordesantos, the region where they come from, it was three genocides that was perpetrated, that was done by the military, the Guatemalan military. And there's no doubt there's enough evidence in the record and also some known fact what happened in those years, A.D. How old were they when they were driven out of Guatemala? The male petitioner was just four years old, and the female petitioner was an infant at that time. Had they ever gone back to Guatemala? No, Your Honor, they have not. They moved to, they went to Mexico, and they were in Mexico, and then from Mexico, then basically they came to the United States. They have not. So they've been out of Guatemala for what, over 20 years? Yes, definitely over 20 years now. And their testimony, they tell what happened through what other people have told them, correct? They don't remember on their own. That is true, Your Honor, because the female petitioner was just an infant. Just a baby, yes. She was just a baby, and she is basically relating to the facts as they were told to her by her mother. The male petitioner was four years old. He has some idea, and that's reflected in the fears that he's exhibited. But, yes, again, he was with his uncle who basically brought him from Guatemala to Mexico, and that is all the facts that he's narrated is basically what the uncle told him. Well, now, tell me, your clients had a drunk driving and a hit-and-run driving, correct? Yes, Your Honor, he came here initially. But they didn't ever make any credibility analysis, did they? They did not. I mean, there's no credibility finding here, is there? There's none, Your Honor, except... Let me ask you another question, then. With no credibility finding, we kind of have to give him credit for what he says. But my worry is somewhat like my colleague here, Judge Silverman. I can talk all I want about whether there was enough to get by the year, but really what they said was, we're taking the alternative finding and we're going there. So even though the IJ made a finding that they didn't get their year, they also made a finding that even if they did, past persecution they've got, but no future persecution. There's no evidence of future persecution, so we're going to move to humanitarian relief. And when he got to humanitarian relief, he said, well, the standard for humanitarian relief is, and there are two standards, two things you can look at. But one was that there was compelling reasons for being unwilling or unable to return to the country out of the severity of the past persecution. And the second was there's a reasonable possibility that he or she may suffer serious harm upon removal to the country. Well, he says, you know, you were kids at the time, so I can't really say it was severe. And we've got no evidence that you're going to have any serious harm when you go home. So I can't give you humanitarian relief. That's what he said. Well, I guess I'm having a tough time understanding how I can disagree with that. They were kids, and all we've got to have is substantial evidence. And then, on the other hand, I have no evidence that there's going to be a big harm to them going back. So, again, I'm on substantial evidence on the alternative finding, and I'm having a tough time helping you. The motion to reopen I don't think helps you at all because it was only filed to challenge the one-year relief. And they said, well, we're not going to worry about that. We're going to go on the alternative finding. So I'm not really big on the motion to reopen. But the original petition that's here, you've got one thing to say. So how do I get there? You know, at the age of the children, there were children at the time. They were four and zero. Four and zero. Right. And this court's ruling in Pablo Mendoza recognized the fact that persecution suffered to the adult can be attributed to. But it doesn't say any. I don't have any case. Give me the good case because you've gone exactly where I wanted you to go. Give me the good case that suggests that humanitarian relief should be granted based on derivative status. Because that's what you're arguing. You're arguing that they ought to get this relief not based on what they did but based on what their parents had happen to them. So give me the best case. Is that true? I mean, it did happen to them. I mean, they were – they didn't – they're not just saying this. I've heard about this. They were living in Guatemala, and they were removed from Guatemala personally. I mean, right? They were personally driven out. This is not just derivative. Yes, and two of the civilians have gotten asylum in this country. But the problem comes in that when you read what the BIA said about that, there's substantial evidence to sustain what they said. And my worry is that I needed a good case to suggest that when you're a kid and you come out of there and it isn't really you who suffered the persecution, which is what the – which is exactly what the BIA said, that there is no substantial evidence for that. Because the BIA said these events do not rise to the level of compelling reasons or abuse. It's one event. Although they have suffered residual harm, neither of them has any memory of the killing or the flight. The male respondent's parents each returned to Guatemala prior to their deaths. The female's respondent's depression and post-traumatic stress disorder stem in part from stress from leaving a daughter behind with her mother and of the rape which occurred in Mexico, not in Guatemala. So, I mean, I'd love to go where you want to go. In fact, I think it's a terrible shame. So give me some help. Thank you for giving me that opportunity. If you look at the matter of Chen, or if you look at the Second Circuit decision in Bukhar, a matter of Chen also talks about what the father suffered and thereafter what the child suffered. It's a parent and a child, because Chen was a minor at that time. In our case, obviously because of the age, especially they did not really suffer anything directly, but it was all based on what the parents – what happened to the parents. And they were basically uprooted from their own country and they had to take refuge in Mexico and now they are here in the United States seeking asylum. Now, I'm curious, the other siblings that you said that got asylum, was it humanitarian asylum? Jana, frankly, I'm not privy to that information. Are they older? Yes, they are, because he was the youngest. Okay. You're really asking us to extend precedent, is that correct? Yes. Okay. Well, what precedent are you asking us to extend? The precedent that was set by this Court in Pablo's case, whereby you basically attributed the harm that was suffered on the parents, on the child. And though the finding in that case was past persecution, whether past persecution had been established or not, but taking the same concept here also, because usually – I think you understood Judge Gallagher's question. Are you asking us to apply the precedent or to somehow take the precedent further than what it is? To take it further than what it was in the humanitarian argument. In other words, you're asking us to take a case that doesn't deal with humanitarian aid, but does deal with, frankly, the fact that their fathers or mothers did something wrong and it had to do with past persecution, and you're asking us to use that same context in a humanitarian aid situation. Yes. The concept. Yes. Got it. Thank you. Thank you. Okay.  Good morning. Good morning, Your Honors. May it please the Court, Melissa Nyman-Kelting for the Attorney General. I think the issues in this case have been delineated so far by the panel, and I think Petitioner's troubles are illustrated by the fact that there simply isn't substantial evidence to support their reading of the record. And here there is no case extending the precedent that Petitioners would like to extend for the grant of humanitarian asylum. So tell me why they're not as sympathetic as they sound. I don't think anyone is asserting that they are not as sympathetic as they sound, Your Honor. Here the agency gave two dispositive reasons for the denial. We had the initial time bar finding that they just didn't meet the clear and convincing standard with their evidence. And alternatively, that they didn't on the merits warrant a grant of humanitarian asylum because everyone agreed there wasn't, in fact, much discussion that what happened to these individuals was past persecution. Everybody agreed that issue was not in dispute. It actually happened to them, right? Your Honor is correct in that they were forced to leave their town, their village. This is not a derivative situation. They actually suffered past persecution themselves. I think that's correct, Your Honor. I think that's how the agency read what happened here as far as the matter of fact, though, right? Correct. They're not saying, gee, I heard my father had to leave. They forcibly were evicted from Guatemala. That's correct. The reference to hearing things from other relatives is because they were so young at the time. They had no independent memory of what happened. Here's the question I have. Yes. I'm having a hard time if we're going to have something called a humanitarian grant. Maybe there shouldn't be, but if we're going to have something called a humanitarian grant, I'm having a hard time understanding why people who were driven, forcibly driven out of their country as part of a genocidal ethnic cleansing there and haven't been back in over 30 years should be required to go back to Guatemala. I mean, if they're not entitled to a humanitarian grant, who is? I mean, who else would qualify? What else do you need? Well, this Court and the Board, when looking at this very rare discretionary grant of relief, have looked to the agency's precedent in Chen, and this Court's decision extending that in a very rare number of cases, specifically in a case out of Laos where the individual suffered similarly horrific persecution as the individual in Chen, which was multiple years at a reeducation camp, insufficient medical care, beatings, his thumb was severed, then forced to work by the government in a job and unable to leave the country until he was managed to escape and then was granted asylum here on the basis of the past severity of the harm. How do you ask people who have been driven out to go back to a country they haven't been to in 30 years when they left when one was an infant, one was four years old? It's not like they left there to find a better life in the United States. They were driven out. As a matter of humanity, how do you tell people to go back to this country they were evicted from? That's a reasonable point, Your Honor, and here I think the answer is twofold. Here the agency initiated a precedent in matter of Chen, and then it was ultimately promulgated into the regs that there are two bases for establishing eligibility for this discretionary relief, this very rare discretionary relief. And here the agency reasonably looked at the past harm, and everybody agrees what happened in the past to these individuals was persecution. But in looking forward and in analyzing whether it was compelling, the severity of the past persecution was either so compelling or that they would likely experience serious harm, in this case, based on the facts of this case and in these circumstances, the agency reasonably determined that that just simply did not meet their burden in this case. It was in fact their burden. Let me just think out loud. If we were to disagree with you, if we were to say that what's happened to them would qualify for humanitarian relief, we would then send it back to the BIA, would we not, to decide whether the motion to reopen should be granted on the timeliness issue. They would have to then look at whether the new evidence would or would not shed light on the timeliness thing. I think that's right, Your Honor, because here there is an interplay, even though, as Your Honor has pointed out, the agency didn't make any findings on the evidence submitted in the motion to reopen. They didn't find whether it was new, previously unavailable, and met the requirements for reopening. They simply, as they were entitled to do, moved to the alternative bases, which was the IJ evaluated your claim on the merits and determined that you didn't meet your burden, and your motion has not overcome that, so you have not met your heavy burden for reopening. If this Court determines that he would have to succeed on the merits, right, he has to be able to show that he can succeed in order, because it's the same as asylum. You have to get past the year. As a matter of course, but, yes, humanitarian asylum also falls under the one-year bar, unlike withholding and cap protection. So if you sent it back, it's not inconceivable the judge could say, your new evidence doesn't convince me it was timely. You're out, no matter how horrendous the circumstances. I mean, that's the reality of it. That is the unfortunate reality of the situation, should the Court determine that they would even have jurisdiction over the time bar finding and find that they could send it back to the BIA. If the BIA takes it, if just hypothetically we send it back, the BIA says, in our discretion, we find it wasn't timely. We don't believe the Lady Rosa, whoever it was. That's the end of the ball game. I think we all have to agree. And I think that that's a point that it's worth bringing to bear, that the time bar finding does directly control the outcome of the merits on humanitarian asylum. So even if this Court is uncomfortable and disagrees with the result from the agency based on the substantial evidence in the record and just as an overall matter of abusive discretion, Petitioners still have to overcome, either of them have to overcome the hurdle of the time bar. And as counsel pointed out, these are two separate applications. She conceded that hers was untimely and proffered reasons why she should get an exception. However, the motion to reopen did not address any of those reasons. It simply was very narrow in scope and only argued that now they finally found Rosa at a store a year or so after the hearing and were able to get a declaration from her and proffered that as new and previously unavailable evidence of the timeliness. Now, her reason has to do with PTSD, right? Is that why she said she didn't file on time because of the rape and all of it? That was the second reason that she gave, Your Honor. The first reason that she gave in her asylum application and that was proffered by counsel during the hearing, which occurred where initially started she was a derivative of her husband. And there was some discussion on the record of the hearing that the counsel said, well, for administrative efficiencies, they wouldn't have let her file her own because they said, oh, you're a spouse. Why would you bother filing your own? So she just went on her husband's as a derivative. And then later into the hearing, they have the doctor whose report that's not challenged that she suffers from major depressive disorder and PTSD. So under this Court's case law, that is a disputed fact. It's the reasoning for why she failed to file within the one-year time frame and would be a disputed fact, depriving this court of jurisdiction to reach and subsequently overturn the agency's time bar finding. As to the female Petitioner and the fact, coupled with the fact that they did not press any point in their motion to reopen when they attempted to reopen on time grounds, they were really only going for Mr. Matias's asylum application because the evidence was only relevant to whether he could establish that date, which is very important, given that he was relying on also his wife's testimony that she was six months pregnant. But you can be six months pregnant on April 3rd, and you can also be six months pregnant on March 27th. And if it had been March 27th, it still would not have been timely. Let me go a little bit different direction. I kind of agree with you as to your jurisdictional argument as to whether we can get in on the time issue. But I'll be fair. This is a tough case. These people have been in the United States for a long, long time. Yes. They have no relationship, really, with Guatemala. None. And they've been in Mexico most of their lives. That's correct, Your Honor. I think the government sees the, if you will, the problem that we have here. Yes, Your Honor. And while exact stuff that comes out of Belista versus Ashcroft may not have been met here, or substantial evidence would at least sustain what the IJ said or the BIA, it seems to me that this case, particular case, cries out for something, cries out for the government to do something. I mean, I've seen all these memos come down about, well, we're not going to do these cases anymore that have nothing to do with crooks. We're not going to do this. We're not going to do that. And then I'm hit with this case. And I'm saying, why has the government not mediated this case? Why don't you get involved? This seems to be one which cries out for something. I mean, I can go along because I'm stuck with the law. I can go along and buy every one of your arguments. But underneath, if I had my say, I'd find a reason not to do it. I'd find an exception to be made because I just don't understand this. These were kids whose parents were absolutely horrifically dealt with. They were thrown out of the country. Yes, they didn't suffer it. They just suffered being thrown out, so I can't say it's severe. But good night. They've been here forever. And when they weren't here, they were in Mexico. Why are we using all of our power and might with all the other things we've got going to send them home? That's the thing that worries me. Your Honor's concerns are not unreasonable. And I certainly understand the point that you're making here. In this case, I would note that I have reached out to DHS prior to coming to argument to ask if they would be willing to consider what Your Honor is referring to, I believe, as prosecutorial discretion. Or mediation, where you could get there. Right. That would be the form in which the parties could discuss. I would note that I don't know that there's been any effort from my opposing counsel to reach out to the government. It's a two-way street. Would you give it another shot if we were to, like, hold off on this for a few days? I mean, if opposing counsel, if what I said isn't enough for opposing counsel to think he better get involved in mediation to help his clients, then I'll say it harder. I mean, I don't think you've got a case unless they come to the party and I've told them why I think they ought to. So I don't come up with some exception that destroys the rule because the hard facts make bad cases. That's correct, Your Honor. Well, and so if you get a panel that strictly follows the law and you don't, you know, that's one thing. But if, you know, judges are people too. And if given the opportunity to extend precedent under compelling facts, that isn't necessarily, I think, what Judge Smith has said, that's not a good government option because sometimes extending humanitarian relief beyond what it should be extended because there isn't a good exercise of discretion probably doesn't benefit the orderly development of the law. I would agree with that, Your Honor. So let me ask you, are you willing to give it another shot? Oh, absolutely. To be clear, the government has no objection to the panel's preference to refer this case to mediation to give the parties an opportunity to see if we can come to a mutually agreeable alternative to litigation. I, for one, appreciate both your candor and your open-mindedness on this. Well, and I think that the argument that you make to the people that control this is representing the petitioners, the law presents you with difficulties as it presently exists if a panel does not want to extend precedent. That, you know, the facts present the government with a situation that tempts judges to extend precedent. And if in a published opinion, sometimes that, you know, is more damning than making a discretionary call where you control the outcome and you control, you know, you still have the same, you maintain the same framework to keep humanitarian relief a very limited form of option. I guess we're about to beat this one. Thank you very much.  I appreciate the time. Thank you very much. Thank you, Ms. Nyman-Kelty. You did a good job articulating it. Mr. Gar, I assume you have no objection to us referring the matter to mediation? Okay, thank you. We'll proceed from there. Thanks again. And, ma'am, I would say you've represented the government very well today. I don't want anybody at your office to think you didn't. I think you just ran into what was reality here.
judges: Silverman, Callahan, Smith